UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) No.:  21 CR 592 (ABJ) |
| | ) |
| DAWN FRANKOWSKI, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

The defendant, **DAWN FRANKOWSKI,** by and through her attorney, **PABLO DECASTRO,** pursuant to Rule 32 of the Federal Rules of Criminal Procedure and United States v. Booker, 543, U.S. 220, 125 S. Ct. 738 (2005), respectfully submits this sentencing memorandum.

---

Dawn Frankowski comes before the Court for sentencing after a plea of guilty to Parading, Demonstrating or Picketing in a Capitol Building in violation of 40 USC § 5104(e)(2)(g), a Class B Misdemeanor offense. The Sentencing Guidelines do not apply. The Court must look to 18 U.S.C. § 3553 in determining an appropriate sentence.

Pursuant to 18 U.S.C. § 3553(a) the court must impose a sentence *sufficient but not greater than necessary* after considering the factors listed in §3553(a).

### A. The Nature and Circumstances of the Offense

Ms. Frankowski went to DC to attend the "Save America Rally." It was a legal, permitted event at the Ellipse. It was promoted as a peaceful event. Ms. Frankowski describes her interest by saying she wanted to go, "to support my president." She did not and does not have strong

1

feelings about voting irregularities, or the election being "stolen." She was not in D.C. in response to any of the promotion calling it a "stop the steal" rally, nor any promotions referencing any action at the Capital or any action intended to affect Congress directly. She was there to support President Trump and hear him speak, because she supported Mr. Trump politically. It has been shown that hundreds, if not thousands of individuals came to D.C. with the intent to disrupt the Congressional process, and even intending to do so violently. Ms. Frankowski had no such intent.

Ms. Frankowski was still at the Ellipse, still listening to speakers on stage there including Mr. Trump and others, when at approximately 1:00pm members of a violent crowd advanced over barricades near the Capital Building almost two miles away from where she was. That crowd continued breaching barricades and advancing closer to the Capital, eventually overwhelming officers of the US Capital Police and making violent entry into the US capital at approximately 2:00pm. (PSR Paragraph 11). Ms. Frankowski was still at the Ellipse. Mr. Trump concluded his speech at approximately 1:15pm. Ms. Frankowski and Mr. Weirsma were towards the front of the audience, only 20 rows or so from the stage. They were unable to move from the area until the crowd dispersed, so they waited there for some time.

As the crowd from the ellipse started walking towards the Capital, Ms. Frankowski followed along. (Gov. Sentencing Memo, and PSR at 15). She was not charging forward like those far ahead of her had done. She was walking. She and Mr. Weirsam stopped along the way to buy scarves. She did not reach the Capital until approximately 3:00pm, two hours after the first barricades were breached and one hour after the entrance she used had been breached. She saw people flowing in and out of the Senate Wing doors, which were open. She saw a line of Capital Police Officers standing inside just to the left of the doors. When she followed the crowd

in through the doors, she greeted the officers and thanked them, "for their service." She and Mr. Werisma wandered around with the crowd for approximately 11 minutes and left the building as peacefully as they had come. They did not damage anything, steal anything, or even touch anything. They were respectful to the officers, never refusing any order to leave, as has been need noted in many other cases.

### B. The History and Characteristics of the Defendant

Dawn Frankowski is 54 years old. The government points out that she has had "several prior arrests." Specifically, on five occasions she was falsely accused of domestic battery by a spouse who was abusive and manipulative (PSR 32-36 and 40). Each and every time the charges were dismissed. She also had two DUI arrests in which she was found Not Guilty (PSR 37, 38), and one DUI arrest for which charges were dismissed in court (PSR 39). There is a reference in Paragraph 42 to another DUI in 2012. Ms. Frankowski did plead guilty to that DUI. She received a sentence of court supervision that included treatment. She has been sober ever since. The only other time she has been found guilty of a crime was when she was 20 years old and was arrested for a Minor in Possession of Alcohol offense. She was also charged with resiting/obstructing in connection with that incident based on lying about her name and age. The resisting charge was dismissed. The minor in possession of alcohol charge was disposed with a plea of guilty and a sentence of court supervision which was terminated on the same day it was imposed. Despite the characterization of "several arrests," she never actually committed any crime more serious than possessing alcohol when she was 20 years old and a single DUI in 2012.

Ms. Frankowski was in a long-term relationship beginning in high school and continuing until her mid-twenties. Though they weren't married, they did live together and had two children. She had a third child during a subsequent relationship. She was a full-time mother until

her third child started 1st grade. It was then that Ms. Frankowski went back to school. The PSR indicates she has an associates degree from Joliet Community College, but she went on on from there to get her Bachelor's from DeVry University. Her bachelor's degree is in computer science/data base management. She was employed for six years with Applied Systems in University Park, IL managing a medical insurance database. She left that job for the promise of greater opportunity at SDL International, doing customer support systems management. Unfortunately that company downsized and she lost that job after only one year. It was at this time that she went into bartending to make ends meet. She met and married her husband. The marriage lasted only a few years and was the source of all those false domestic battery arrests. It was not a healthy relationship. Her 2012 DUI was a wake-up call. She ended that relationship and took her alcohol abuse counseling seriously. It was turning point in her life.

Ms. Frankowski has recovered from that bad period in her life. She admits she was abusing alcohol during that time. She has been through counseling and has been sober since 2012. She also quit bartending as part of her recovery. She had trouble getting back into her chosen field of database management, so she started taking work as a painter, getting jobs with various friends and family members who run construction and remodeling companies. She has been working as a painter for several years. It is not her chosen profession, but it affords her flexibility so that she can spend time with her grandchildren. She watches her grandkids 3 days a week.

**C. The need to afford adequate deterrence and to protect the public**

In this case the prosecution itself serves the goal of general deterrence. Ms. Frankowski and 700 others were arrested all over the country. Their prosecution has been the subject of almost daily national news coverage for well over a year. The theory of general deterrence has

been described as "sending a message."  Based on testimony from an expert witness analyzing decades of empirical research, Judge Weinstein of the Eastern District of New York put it this way: "Degree of certainty – as opposed to the length and severity – of punishment provides the strongest general deterrence effect….. People are more motivated by the probability of getting caught than the severity of the punishment." (NYED 16 CR 243-JBW, Document No. 73, Pg. 7, citing the Report of Jeffery Fagan, PhD.)  The point is that general deterrence is served by the very public fact of so many arrests and prosecutions. This sentencing goal should not move the court to impose harsher penalties.  In this case, with the arrest and prosecution itself the message has been sent.

      The "need to protect the public" on the other hand refers to specific deterrence. The penalty serves this sentencing goal if it motivates the specific individual to refrain from future criminal activity. In this particular case, this is not a factor that should weigh heavily on the mind of the Court. Ms. Frankowki has demonstrated her respect for the law from the outset. Even during her offense she paused to speak politely to the officers. When she was approached by the FBI she was immediately cooperative, answering questions freely and consenting to searches of her phone and social media accounts.  She offered further cooperation in identifying other individuals. In fact, when she was initially approached it was apparent the FBI thought she was another individual named Dawn who was more of an organizer and event promoter. Ms. Frankowski was not the Dawn they were looking for, but she offered to help the FBI identify the other Dawn.

      Her arrest and prosecution in this case has had a deep and lasting impact on Ms. Frankowski. She has no desire ever to experience anything like this again. She is perhaps more

deterred than the Court could want, saying she has no desire to ever return to Washington DC, nor to ever attend another political rally or demonstration of any kind. Message received.

   **D. The need to avoid unwarranted sentencing disparities:**

The defense agrees with the assessment of the probation officer who said, "Ms. Frankowski's culpability appears to be minimal in contrast to individuals who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date." The government has called her an, "average participant," which seems an unreasonable assessment. The range of criminal activity here goes from trespass to murder, and Ms. Frankowski is clearly down on the trespass end of the continuum.

The government has provided a chart (Government's Attachment #1, Docket #64) to help this analysis. It may be helpful to look beyond the chart to details of the offenses in certain cases. For example, Elial Rosa (21CR68TNM) received 12 months probation and 100 hours community service. He entered the building in the midst of and encouraging physical struggle with officers to achieve entry, advanced through clouds of pepper spray, heard gunshots, and saw people banging on doors. Andrew Wrigley (21cr42ABJ) received 18 months probation and 60 hours community service. He entered the building through the upper west terrace doors 4 minutes after the initial breach of that entry, as part of the mob, participating in the violent entry itself. A mitigating factor is that he left after only one minute inside. Amy Schubert (21CR588ABJ) received 18 months probation. She entered the building by climbing up a wall and through a broken window. She proudly posted on social media about getting "maced" as she advanced as part of the mob that achieved the entry into the capital.

The government also points to several cases for comparison in its memo in this case, though the facts as described omit certain relevant details. The government describes the facts of

Sorvisto (21CR320ABJ) in terms that make that case seem similar to the present one, but leaves out distinguishing facts. For example, Mr. Sorvisto's social media posts indicate he came to D.C. with the intent to do violence. He came armed with a Taser. The Government states he "Entered the Senate Wing Doors ignoring signs that it was unlawful to enter such as broken glass." This is clearly meant to echo Ms. Frankowki's entry through the same doors, and with the same broken glass still apparent. But the comparison ignores that Sorvisto entered at 2:25 with heavy crowds and through clouds of teargas. He was part of the violent mob that made the initial breach, and broke that glass, and was probably armed with a Taser. Ms. Frankowski entered more than 30 minutes later, and though there were signs of violent entry, such as the broken glass, that violence was already in the past. She did not participate in or even witness the violence. She was more like a gawker after a violent car crash, as opposed to the reckless driver who caused the crash.

The government's description of the facts in Sarko (21CR591 CKK) is similarly misleading. The Government focuses on the fact that Sarko entered a senate office and the spouse's lounge, and ignored signs such as broken glass, again echoing the present case in that these are the same two rooms Ms Frankowski entered.  But again, the government ignores the difference in what was happening at the time. Sarko observed and encouraged the violent entry itself. He posted things like, "we are storming the Capital," and "we are breaking in right now." By the time Ms. Frankowski got there it was nothing like that. Though she acknowledges she saw the broken glass, and knew she was not authorized to enter, there were literally hundreds of others walking in and out and a line of officers standing just inside the door NOT ordering anyone to leave.

The government's argument seems to be that because she entered the same two sensitive

spaces that Sarko entered she should be treated as if she initiated the violation of those spaces, as Sarko did. With respect to the Senate Office that she entered, her entry was minimal. She stayed at the doorway, waiting for Mr. Weirsma who wandered further inside the room. With respect to the spouse's lounge, she walked in, looked at photographs on the wall and walked out. Comparing her to the rioter who broke those doors open to begin with, or the one who proudly posted a photo of himself with his feet on Senator Pelosi's desk is simply not a fair comparison.

With respect to the last case the government cites the government here finally acknowledges a salient difference. Ms. Buhler (21CR510CKK), differs from Ms. Frankowski in that she was present for the violent entry itself, cheering while others physically crushed officers in the doors. The Government admits that is a "factor not present here." That is correct. It is a factor not present here, and it distinguishes the present case from Buhler. But this same factor is similarly present in all of the cases the government points to for comparison, and it distinguishes all of them from the present case.

The Government's focus seems to be only on where Ms. Frankoski went. This analysis ignores the more important facts and circumstances such as when and how, and what was going on at the time. She did not climb walls or enter by breaking windows; She did not engage in physical combat with officers to force entry; She did not come armed, and did not cheer or encourage violence. Though she could see broken glass, she did not participate in breaking the glass. By the government's analysis, Ms. Frankowski is a more serious offender than Andrew Wrigley (above) who actively joined a mob crushing officers in a doorway to force entry. The government's analysis would treat him as less culpable simply because after committing this crime of violence, he spent less than a minute inside and did not go into more sensitive spaces. It should be important that Ms. Frankoski did not actively participate in or even witness the violent

entry or any of the other horrifying violence of the day.

It should also be important that Ms. Frankowski did not come to DC intending to "storm the capital," or "stop the steal," aka stop the counting of electoral votes. She came to attend a lawful, peaceful, political rally almost two miles away from the Capital. That she let her curiosity take her along with the crowd was clearly bad judgement. That she committed a crime by entering the Capital was worse. She does not seek here to deny her criminal responsibility, but to put in context.

There are a great many individual cases for the Court to consider, obviously. It is a complicated task to sort and categorize the severity of the various sets of facts. The government has apparently decided that entry and the degree of entry is the dividing line. Thousands of people arguably more culpable in inciting and encouraging the violence are not charged because they did not physically enter. Those that entered only hallways are distinguished from those that entered rooms and offices. But by the time Ms. Frankowski came in all the doors to those rooms and offices were open and crowds were milling in and out of them. Hers is a different case than that of the individuals who first opened those doors. The defense acknowledges the difficulty in sorting all these individual cases, but respectfully, the intent of the individual should matter. The timing and the circumstances of what the scene may have looked like from the point of view of the individual should matter. An open door is different than a closed door. Calmly walking past officers who are standing silently by, and even speaking politely to them, is different than physically forcing oneself with the aid of a mob, against officers actively resisting. Again, this is not to deny criminal responsibility here. Ms. Frankowski acknowledges that she committed a crime by entering the Capital on January 6, but her crime is fundamentally different than those with whom the government seeks to compare her.

### E. The need to provide educational or vocational training

Probation's confidential recommendation is for a sentence of probation. Many similarly situated defendants in related cases have received sentences of probation. (Government's Attachment #1, sentencing table). In this case the recommended conditions of probation do not reflect a belief that Ms. Frankowski is in need of any services or assistance in the vein of vocational training or education, or drug abuse counseling or any of the other things probation is so good at. In fact, the recommended conditions of probation are basically the same as the conditions of pretrial release Ms. Frankoski has been complying with for over a year. If the Court is moved to impose a sentence of probation, it should consider that Ms. Frankowski has essentially already served over a year of probation.

Probation has recommended 24 months probation with the only conditions being payment of restitution, community service, financial disclosure, and a firearm restriction. The firearms condition is a standard condition that has nothing to do with Ms. Frankowski, who does not own a firearm, has never sought a license to obtain one, and does not pose a risk of obtaining one. As to the financial disclosures, Ms. Frankowski has already made extensive financial disclosures. Her disclosures were delayed, and not received by the time the PSR was submitted, but they have been completed since. What remains is the fine and perhaps community service. It will not take her two years to pay the restitution and whatever additional fine the court imposes, or to complete an appropriate amount of community service.

**CONCLUSION**

The Court must impose a sentence, "sufficient but not greater than necessary" to meet the goals stated in 3553(a). For all the forgoing reasons the Defendant respectfully disagrees with the Government's recommendation for a custodial sentence. In fact, the Defendant would

respectfully suggest that even a sentence of 24 months probation as recommended by the probation department is "Greater than necessary" in this case.

        Respectfully Submitted,

        S/Pablo deCastro/November 20, 2022
        **PABLO DECASTRO, ARDC No.** 6224763
        53 W. Jackson, Suite 925
        Chicago, IL 60604
        312-690-2626
        pdecastro@attorneydecastro.com

## CERTIFICATE OF SERVICE

I, **PABLO DECASTRO,** depose and state that I have served a copy of the Defendant's Sentencing Memorandum to Assistant United States Attorney, Jason M. Crawford, VIA ELECTRONIC FILING on this 20th day of November, 2022.

        S/Pablo deCastro/November 20, 2022
        **PABLO DECASTRO, ARDC No.** 6224763
        Attorney for the Defendant
        53 W. Jackson, Suite 925
        Chicago, IL 60604
        312-690-2626
        pdecastro@attorneydecastro.com